# *Nicoletti Hornig & Sweeney*

**WALL STREET PLAZA**
**88 PINE STREET**
**SEVENTH FLOOR**
**NEW YORK, NY 10005-1801**
**TELEPHONE 212-220-3830**
**TELECOPIER 212-220-3780**
E-MAIL: general@nicolettihornig.com
WEBSITE: www.nicolettihornig.com

JOHN A.V. NICOLETTI
JAMES F. SWEENEY
DAVID R. HORNIG *
FRANK M. MARCIGLIANO
BARBARA A. SHEEHAN
NOOSHIN NAMAZI †
ROBERT A. NOVAK
TERRY L. STOLTZ
RICHARD W. STONE II
VINCENT A. SUBA
SAMUEL C. COLUZZI †
GUERRIC S.D.L. RUSSELL †
KEVIN J.B. O'MALLEY
WILLIAM M. FENNELL
VAL E. WAMSER †
WALTER A. KRETZ, JR.
LINDA D. LIN ◊

DAVID S. WENGER
LAURA J. O'NEILL †
PATRICK NOLAN †Δ
MICHAEL VANUNU †
CALI L. ECKLER †

\* ALSO ADMITTED IN TEXAS
† ALSO ADMITTED IN NEW JERSEY
◊ ALSO ADMITTED IN CALIFORNIA
Δ ALSO ADMITTED IN FLORIDA

————————

NEW JERSEY OFFICE
505 MAIN STREET, SUITE 106
HACKENSACK, NJ 07601-5928
TELEPHONE 201-343-0970
TELECOPIER 201-343-5882

January 19, 2016

**VIA ECF**

The Honorable Henry Pitman
United States Magistrate Judge
United States District Court
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007-1312

Re:  In re M/V MSC Flaminia
Master File:   SDNY No. 1:12 Civ. 8892 (SAS)
NH&S File:   28000040 JAVN

Dear Judge Pitman:

We write in reference to the Nicoletti letter of December 3, 2015 (Docket Item 780) addressed to the Honorable Shira A. Scheindlin, the Lyons' letter of December 9, 2015 (Docket Item 783) addressed to Your Honor, the oral argument that was held before Your Honor on December 18, 2015, and Your Honor's Order, dated January 8, 2016 (Docket Item 796).

All of the above concern requests for document production served by the Stolt parties directed to the party, MSC Mediterranean Shipping Company, S.A. ("MSC"). Pursuant to the above-identified Order (annexed hereto as Exhibit A), we write to request reconsideration of the Court's denial of Stolt's Rule 34 request for documents which are held by a subsidiary of MSC, namely New Orleans Terminal, LLC ("NOT"). The NOT documents being requested from MSC are identified in the annexed Exhibit B.

January 19, 2016
Page 2

I.      **MSC'S Corporate Structure and Relationship with NOT**

        To clearly demonstrate MSC's control over the documentation maintained and/or possessed by NOT, it is necessary to lay out the corporate structures, which grant MSC control over the terminal's documents.

        During the course of the pre-trial discovery in this case, counsel for Stolt took the deposition of Claudio Bozzo, who supervised MSC's joint ventures during his ten (10) year tenure as executive vice president/president. Bozzo Tr. at pp. 14-16, 18, 33, 34 and 35. Because of the volume of supporting documents, we shall provide the relevant portions of Mr. Bozzo's deposition transcript dated May 6, 2015 upon the Court's request. We annex hereto as Exhibit C a list of pages from Bozzo testimony. His testimony outlined MSC's corporate structure.

        First, to conduct its business in the United States, MSC created Mediterranean Shipping Corporation USA, LLC ("MSC USA"), which acts as MSC's logistical agent for the booking and movement of ocean cargoes to and from the United States. MSC USA is a wholly owned subsidiary of MSC. *See* Bozzo Tr. at pp. 15-19, & 49.

        In turn, MSC USA created its wholly owned subsidiary Container Marine Terminal ("CMT"). CMT was formed to facilitate MSC's terminal ownership and operations in the United States. CMT reports directly to MSC USA. CMT is responsible for creating the joint ventures that operate MSC's terminals, including NOT, through which MSC's ocean cargo is either loaded or discharged from MSC vessels in the United States. *See* Bozzo Tr. at pp. 15, 33-36, 39-42, 50, 51, 67, and 69. NOT's vice president, James Parker, reports directly to Chris Parvin. *See* relevant portions of Mr. Parker's deposition transcript dated September 14, 2014, annexed hereto as Exhibit D at pp. 14, 15, and 175. Mr. Parvin is currently the executive vice president of marine operations at MSC USA (at the time of the subject casualty, he was the vice president of marine operations at MSC USA). *See* relevant portions of Mr. Parvin's deposition transcript dated April 16, 2015, annexed hereto as Exhibit E at pp. 12 and 13.

        CMT has no assets; it is a holding company with the chief financial officer of MSC USA responsible for the preparation of CMT's financial records. MSC USA and CMT have the same corporate office. CMT, itself, has no corporate officers and only maintains a board of directors, which include Mr. Bozzo, Mr. Arena, Mr. Formisano and Mr. Ruiz; all but Mr. Formisano were at the relevant times employed with MSC USA. Mr. Formisano is employed directly by MSC, the party in this litigation. MSC USA and CMT file consolidated financial statements. CMT operates (among other terminals throughout the United States) NOT. *See* Bozzo Tr. at 37-38, 42-48, 60, and 63-66.

        NOT is owned jointly by CMT and Ceres with CMT owning 60% of the 100% shareholder interest. MSC USA maintains control over NOT through CMT. The money invested by CMT into NOT was sourced by MSC USA. NOT tax returns are consolidated with MSC USA. Any operating profits from NOT are funneled through CMT to and consolidated with MSC USA's financial statements. The majority of members of the NOT's board of directors are officers or directors of MSC USA and/or MSC. NOT acts as the agent for receipt

January 19, 2016
Page 3

and stowage of MSC's cargo at the terminal for loading aboard MSC vessels. *See Bozzo Tr.* at pp 41, 47, 49-58.

Based upon the foregoing, it is quite clear that MSC, the party in this litigation, has full control over all books, records and documents maintained and/or possessed by NOT. That control is derived through its wholly owned ownership of MSC USA, which, in turn, controls NOT through its wholly owned subsidiary CMT.

## II.    MSC Has Control of NOT's Documents

The analysis begins with the language of the Federal Rules of Civil Procedure, and specifically with Rule 34. *See Sicav v. Wang*, 2014 WL 2624753 at *4 (S.D.N.Y., June 12, 2014); *Camden Iron & Metal, Inc. v. Marubeni Am. Corp.*, 138 F.R.D. 438, 441 (D.N.J. 1991); Fed. R. Civ. P. Rule 34. Rule 34(a)(1) provides that a party may serve a request for production of documents that are "in the possession, custody or control of the party upon whom the request is served." Fed. R. Civ. P. Rule 34(a)(1). It is well settled that "there is a presumption that a corporation is in the possession and control of its own books and records." *First Nat'l City Bank of N.Y. v. I.R.S. of U.S. Treasury Dept.*, 271 F.2d 616 (2d Cir. 1959)(citing *In re Ironclad Mfg. Co.*, 201 F. 66, 68-69 (2d Cir. 1912)).

In addition, federal courts construe "control" very broadly under Rule 34 and a party is deemed to have the requisite 'control' when it "has the right, authority or practical ability to obtain the documents from a non-party to the action." *Bank of New York v. Meridian BIAO Bank Tanzania Ltd.*, 171 F.R.D. 135, 146-147 (S.D.N.Y. 1997). *See also, Camden Iron*, 138 F.R.D. at 441; *Scott v. Arex, Inc.*, 124 F.R.D. 39, 41 (D. Conn. 1989).

Courts in the Southern District will require production under Rule 34 when the "party has the practical ability to obtain the documents from another, irrespective of his legal entitlement to the documents." *See Golden Trade, S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 525 (S.D.N.Y. 1992); *M.L.C., Inc. v. North American Philips Corp.*, 109 F.R.D. 134, 136 (S.D.N.Y. 1986). *See also Afros S.P.A. v. Krauss-Maffei Corp.*, 113 F.R.D. 127, 129 (D. Del. 1986)(The determination of whether a party should be compelled to produce documents pursuant to Rule 34 is if it has sufficient control over the requested documents that are in the possession of a non-party). A party seeking to defeat a demand for the production of documents must show a "clear proof of lack of control and possession." *In re Ironclad*, 201 F. at 68. In other words, a party must clearly show that it does not have, and cannot obtain, possession of those documents." *Id.*

Courts routinely find that a parent corporation has control over documents in the possession of its wholly owned subsidiary. *Alden v. Time Warner*, 1995 WL 679238 at *2 (S.D.N.Y. Nov. 14, 1995) (corporate defendant was required to turn over its subsidiary's records because the records were relevant and because the party did not demonstrate the "production would be burdensome"); *Dietrich v. Bauer*, 2000 WL 1171132 at *1 (S.D.N.Y Aug. 16, 2000)*(a subpoenaed party was required to produce documents in the possession of its wholly owned subsidiary); Camden Iron*, 138 F.R.D. at 441; *see, e.g., Gerling Int'l Ins. Co. v. C.I.R.*, 839 F.2d 131, 140 (3d Cir. 1988); *Hubbard v. Rubbermaid, Inc.*, 78 F.R.D. 631, 637 (D. Md. 1978); *In re*

January 19, 2016
Page 4

*ATM Fee Antitrust Litig.,* 233 F.R.D. 542, 544 (N.D. Cal. 2005)(citing *U.S. v. Int'l Union of Petroleum & Indus. Workers, AFL-CIO,* 870 F.2d 1450, 1452 (9th Cir. 1989)(stating that for purposes of compliance with Rule 34, a parent company has control of documents in the custody and possession of its wholly owned subsidiary).

"The determination of control turns upon whether the intra-corporate relationship established some legal right, authority or ability to obtain requested documents on demand. Evidence considered by the courts includes the degree of ownership and control exercised by the parent over the subsidiary, a showing that the two entities operate as one, demonstrated access to documents in the ordinary course of business, and an agency relationship." *Desmeth v. Samsung America Inc.,* 1998 WL 75297 at *9 (S.D.N.Y. Feb. 20, 1998)(citing *Camden Iron & Metal v. Marubeni America Corp.,* 138 F.R.D. 438, 441 (D.N.J. 1991).

Based on the testimony of Mr. Bozzo, it is undeniable that MSC, as an international ocean carrier, cannot operate in the United States without the logistical services performed by MSC USA and without the terminal services performed by NOT. Documents are routinely shared by these entities. In fact, when reviewing MSC's operation as a whole, it is clear that MSC, MSC USA and NOT operate as a single unified unit with regard to the movement of cargo through the port of New Orleans.

In addition, courts have also found that requisite control where "a subsidiary corporation acts as a direct instrumentality of and in direct cooperation with its parent corporation." *Sicav, supra,* 2014 WL 2624753 at *4 (S.D.N.Y., June 12, 2014)(citing *Gerling Int'l Ins. Co. v. C.I.R.,* 839 F.2d 131,140 (3rd Cir. 1988)(citing *Acme Precision Prods., Inc. v. Am. Alloys Corp.,* 422 F.2d 1395, 1398 (8th Cir. 1970)).

No doubt, NOT acts in direct cooperation with MSC, its parent corporation, by virtue of the corporate relationship and the existence of the agency agreement for terminal services between NOT and MSC USA.

Other factors that the Court may consider to determine if the party in the litigation has control of documents in the care, custody or control of a non-party corporation concern the financial dependency or overlap among the parent and its subsidiaries. Also to be considered is the extent of any common ownership, management, directors or officers. Further, the non-party's connection to the transaction at issue. *See Vacco v. Harrah's Operating Co.,* No. 107-CV-0663, 2008 WL 4793719, at *10 (N.D.N.Y. Oct. 29, 2008); *Playboy Entm't Grp., Inc.,* No. 96-CV-94, 1997 WL 873550, at *3 (D. Del. Dec. 11, 1997); *Camden Iron,* 138 F.R.D. at 441-42.

Here, MSC has "control" over the requested documentation because (i) MSC USA and NOT file consolidated financial statements, (ii) MSC, MSC USA and NOT share common board members and (iii) NOT was directly involved with the handling of the DVB cargoes (which are the subject of this litigation) through its activities as terminal operator in New Orleans on behalf of MSC and MSC USA.

January 19, 2016
Page 5

The mere non-party status of the wholly owned subsidiary, such as NOT, does not shield the subsidiary's documents from production. *Hubbard*, 78 F.R.D. at 637; *see also Advance Labor Serv., Inc. v. Hartford Accident & Indem. Co.*, 60 F.R.D. 632, 633-34 (N.D. Ill. 1973)(finding that requested documents of separate company with identical directors and shareholders must be produced); *George Hantscho Co. v. Miehle-Goss-Dexter, Inc.*, 33 F.R.D. 332, 334-35 (S.D.N.Y. 1963)(granting motion for discovery despite defendant's objection that the material sought was in the possession of its subsidiary). The same principles apply where a subsidiary is not owned directly, but rather is owned by an intermediary corporation that is a wholly owned corporation of the parent. *Lethbridge v. British Aerospace PLC*, No. 89-CV-1407, 1990 WL 194915, at *1 (S.D.N.Y. Nov. 28, 1990).

Based on the foregoing, we ask the Court to reconsider its present Order denying production of NOT's documents through the document request served upon the party MSC and order the production of those documents as soon as practicable.

### III.   Stolt's Narrow Request for MSC's Booking Documents

Pursuant to item 3 of the Court Order, Stolt and MSC were directed to meet and confer to attempt to limit the scope of Stolt's requests, which are identified in the annexed schedule, Exhibit F. The parties were also directed to report to the Court on the burden to MSC if required to respond to the requests as limited. We regret to advise that the meet and confer did not result in a compromise on MSC's production. Please see the correspondence annexed as Exhibit G. The latest excuse raised by MSC is solely based upon MSC's counsel's unsubstantiated statements on burden. MSC's position is further belied by its counsel's statement in the 5th paragraph of counsel's January 13, 2016 e-mail. In that paragraph, counsel states that the review will cost some $1.20 per document. We are seeking discovery of 9,000 documents with a cost of approximately $10,000.00, if MSC's counsel is to be believed. The January 13th e-mail is included as part of Exhibit G. The amount in controversy overrides the unsubstantiated MSC's cost burden even if it exists.

In our efforts to reach an agreement, Stolt limited its requests for documents to three ports, Houston, New Orleans and New York and initially limited the time period to one year, June 1, 2011 to June 1, 2012 – subject to review of that production.

MSC's counsel has advised that MSC has identified 44,000 bookings of non-reefer hazardous cargo, which it carried from January 1, 2008 to December 31, 2012 – a five (5) year period which is approximately 8,800 bookings per calendar year. As noted above, we have initially limited our request to a one (1) year period which requires the production of documents relevant to the 8,800 bookings for the time period beginning June 1, 2011 through June 31, 2012- which is one year prior to the incident at issue. MSC's counsel has estimated the production involves some twenty (20) pages of documents per booking, which consists of approximately 176,000 pages. We also request documents relating to the 133 bookings of DVB cargo from 2006 to July, 2012.

Because most of the production is conducted through electronic processing, there should be limited copying cost associated with this production. MSC's counsel has countered by saying that it would cost roughly $1.00 to $1.20 per document for this production which allegedly requires a review by both the vendor producing the documentation and a further review by MSC's counsel. There is no privileged material in this documentation; therefore, no extensive review is required. In addition, we have agreed to limit the disclosure of these documents to attorney's eyes only prior to any further disclosure to clients. This production is merely an electronic gathering and transmission effort, which raises doubts on the accuracy of MSC's unsupported costs. Further, the cost is inconsequential in comparison to the $300 million recovery, which MSC seeks from the Stolt parties.

First, it is important to understand the relevance of Stolt's requests for these particular documents.

MSC is seeking to impose liability upon the Stolt entities for failure to warn of, or instruct on, the safe handling of the DVB cargoes. MSC has added a twist to this duty to warn/instruct obligation by alleging that the warnings or instructions must flow only through MSC's booking department and that its receipt of warnings and instructions through some other MSC department or agent is inadequate to satisfy those obligations. Obviously, Stolt disagrees with MSC's gloss on these duties to warn/instruct which has not been judicially recognized.

Assuming for the sake of argument that Stolt had a duty to warn or instruct only through MSC's booking department, this brings to the forefront the second element of the duty to warn/instruct to impose liability upon a party for any such failure. To impose liability upon Stolt for alleged failure to warn/instruct, MSC must demonstrate that it would have acted on such warnings or instructions.

The Stolt requests seek documents from MSC's booking department where MSC can demonstrate that receipt of warnings or special instructions to the booking department either (1) resulted in a refusal to carry the cargo or (2) the communication of those instructions to the appropriate MSC department, including its ocean terminals to follow the instructions to safely care for and carry the cargo. It is this latter element of the duty to warn doctrine for which Stolt's requests are most relevant.

By way of example, MSC alleges that it was not warned or instructed to stow DVB above deck or away from heat sources, because those warnings or instructions did not appear in Stolt's booking request and only appeared in Stolt's master bill of lading instructions sent to MSC's document department. MSC's argument is that the warnings or instructions in the master bill of lading instructions did not satisfy Stolt's legal obligation. Whether the latter argument is true or not is in dispute, but what is not in dispute is that the warning or instruction was provided to MSC. Therefore, examining the operations of MSC's booking department when receiving the special instructions and how they are carried out is relevant to this inquiry. For example, did the MSC booking department receive warnings or instructions on prior cargoes of DVB (which MSC carried some 133 times) or other hazardous cargoes and were those instructions communicated to the planning and/or other MSC involved departments or terminals and/or in

January 19, 2016
Page 7

any other way complied with.  Only examination of the MSC records would either support or belie MSC's contentions.

By virtue of the foregoing, we ask the Court to order production of documents as outlined above.

Respectfully Submitted,

NICOLETTI, HORNIG & SWEENEY

By:

John A.V. Nicoletti

JAVN/mm
Enclosures

**cc (via ECF):**

ALL COUNSEL