**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------- X

IN RE M/V MSC FLAMINIA

----------------------------------------------------- X

```
USD...  ...
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/27/16
```

**OPINION AND ORDER**

**12-cv-8892 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.   INTRODUCTION

On December 7, 2012, Conti 11. Container Schiffahrts-Gmbh & Co.

KG ("Conti") and NSB Niederelbe Schiffahrtsgesselschaft MBH & Co. KG

("NSB"; together "Petitioners") commenced this action under section 30511 of

Title 46 of the United States Code, seeking to limit their liability relating to a July

14, 2012 explosion and fire on the MSC Flaminia (the "Vessel"), a cargo ship

owned by Conti and operated by NSB.[1]   The fire resulted in the deaths of three

crew members, including Cezary Siuta, the Chief Mate of the Vessel.  Iwona Siuta,

Cezary's wife, filed a claim against Petitioners seeking damages as representative

---

[1]      *See* 46 U.S.C. § 30511(a) ("The owner of a vessel may bring a civil
action in a district court of the United States for limitation of liability under this
chapter.  The action must be brought within 6 months after a claimant gives the
owner written notice of a claim.").

-1-

of Cezary's estate under the Jones Act, the Death on the High Seas Act

("DOHSA"), and the general maritime law of the United States.

Petitioners now seek to dismiss the claim brought by Siuta's estate

(the "Estate") on the basis that neither the Jones Act, DOHSA, nor the General

Maritime Law of the United States apply to this case.  According to Petitioners,

German law applies exclusively to the Estate's claim.  For the following reasons,

Petitioners' motion is GRANTED.

## II.   BACKGROUND[2]

### A.   Conti and the Vessel

Conti is the owner of the Vessel.  It is a single-ship owning entity

registered to do business in Germany.[3]  Conti's parent, the Conti Group, also a

German entity, built the Vessel in Korea.  The funds for the Vessel came mainly

from European investors — of the eight hundred investors, fewer than five are

residents of the United States.[4]  None of the owners, officers, or directors of Conti

Group reside in or are citizens of the United States.[5]  Conti does not pay corporate

---

[2]     The following facts are undisputed unless otherwise noted.

[3]     *See* Claimant Iwona Siuta's Response in Opposition to Petitioners' Rule 56.1 Statement ("Estate 56.1"), at 8.

[4]     *See id.* at 9.

[5]     *See id.*

or income tax to any United States agency, and does not deal directly with any American banks.[6]  Conti does not have offices or subsidiaries in the United States.[7]

Between 2006 and 2012, the Vessel visited United States ports 199 times — an average of two visits per month.[8]  At the time of Siuta's death, the Vessel was sailing from Charleston to Belgium.[9]  The Vessel's charterer was Mediterranean Shipping Corporation ("MSC"), a Swiss Company.[10]

### B.    NSB

NSB is a German ship management company that operates various vessels on behalf of several ship owning companies.[11]  "Forty percent of NSB's business consists of NSB vessels traveling to and from United States ports."[12]

> According to NSB's corporate representative, Torge Schulz, NSB's business involves three primary routes.  The busiest route, involves vessels traveling from Europe to Asia.  According to NSB's  Corporate  Representative,  Torge  Schulz,  this  route

---

[6]    *See id.* at 12.

[7]    *See id.* at 13.

[8]    *See* Claimant Iwona Siuta's Response in Opposition to Petitioners' Motion for Summary Judgment ("Estate Opp."), at 14.

[9]    *See id.* at 15.

[10]    *See* Estate 56.1 at 9.

[11]    *See id.* at 1.

[12]    *Id.* at 3.

represents 60 percent of NSB's business.  The second busiest
route, involves NSB vessels traveling from ports in the West
Coast of the United States to ports in Asia — and back.  This
route represents 30 percent of NSB's business.  The third busiest
route, involves NSB vessels traveling from ports in the East Coast
of the United States to Europe — and back.  This route represents
10 percent of NSB's business.  All in all, therefore, 40 percent of
NSB's business consist of NSB vessels traveling to and from
United States ports.[13]

"Between 2006 and 2012, NSB vessels visited United States ports 4,355 times."
That is an average of [two] daily visits to the United States, each day of the year,
for [seven] years."[14]  "All in all, between 2006 and 2012, NSB vessels spent 2,527
days in [ ] United States [ports]."[15]

NSB advertises on its website that it has permanent offices in
Germany, Singapore, South Korea, and the United States.[16]  The United States
office is listed as "NSB-USA."  The parties dispute the status of NSB-USA.
According to Petitioners, "NSB-USA is an independent contractor of NSB" and
NSB-USA was founded by Jonas Lyborg, "as a subsidiary of his original and
continuing company, J.L. Maritime," on "Lyborg's initiative alone[,]" not at the

---

[13]     *Id.*

[14]     *Id.* at 4.

[15]     *Id.*

[16]     *See id.* at 5.

-4-

direction of NSB.[17]  According to the Estate, "[d]espite attempts by NSB to disguise this office as an independent entity . . . discovery revealed that at all relevant times the Alabama office has existed for the single and exclusive purpose of managing NSB's business affairs in the United States."[18]  The Estate claims that "[t]here is no questions that Mr. Lyborg is NSB's permanent agent in the United States."[19]

Lyborg is an American citizen, and as stated in his contract with NSB, he is a "Key Person" for NSB in the United States.[20]  The contract states that NSB-USA's mission is to provide services for NSB "within the territorial waters of the United States of America . . . to protect the interests of NSB, including but not limited to, services as a commercial representative, services as a technical advisor and services as a security advisor."[21]  NSB does not own an interest in NSB-USA.

None of the owners, officers, or directors of NSB reside in or are citizens of the United States, except potentially Lyborg, whose role the parties

---

[17]     Petitioners Conti 11. Container Schiffahrts-Gmbh & Co. Kg and NSB Niederelbe Schiffahrtsgesselschaft MBH & Co. KG.'s Reply Memorandum of Law, at 5, 6.

[18]     Estate 56.1 at 5.

[19]     *Id.* at 9.

[20]     *Id.* at 6 (internal quotation marks omitted).

[21]     *Id.* (internal quotation marks omitted).

dispute.[22]  None of the approximately 170 ships which are managed and operated by NSB are registered in the United States or are owned by an American Company.[23]  NSB does not pay corporate or income taxes to any United States agency.[24]  Other than the possible exception of NSB-USA, NSB does not have offices or subsidiaries in the United States.[25]  None of the NSB managed vessels were registered in the United States.[26]

NSB Reisboro is a subsidiary of NSB, which operates as NSB's travel branch.  While NSB operates traditional container cargo vessels, the travel branch arranges passenger cruises on board the cargo vessels.[27]  NSB derives less than one percent of its gross income from passenger service on its cargo ships.[28]

### C.    Revenue Streams and Charterers

The shipowners for which NSB manages vessels, such as Conti, have

---

[22]    *See id.* at 9.

[23]    *See id.* at 10.

[24]    *See id.* at 12.

[25]    *See id.* at 13.

[26]    *See id.* at 8.

[27]    *See id.* at 21.

[28]    *See id.* at 22.

long-term "charter" or ship-leasing agreements with third-party cargo carriers.[29]

For example, there was a charter agreement between Conti and MSC with respect

to the Vessel.  NSB has a corresponding management agreement with the

shipowner.[30]  Thus, shipowners receive their revenue in the form of charter-hire or

ship-leasing payments from the charterer.  In Conti's case, its income was earned

almost entirely from the charter hire paid by MSC to lease the Vessel.[31]  Operators

such as NSB earn their revenue from ship management services.

      "Pursuant to the various Charter Agreements, the chartered vessels are

allowed to call at any safe ports in the world at the charterer's direction, including

ports in the United States, for the purpose of loading and discharging cargo."[32]  The

cargo loaded or discharged is contracted for carriage by the charterer of the

particular ship, or its agents, and the freight, handling, stowage and other charges

for the ocean carriage is paid to and received by the charterer.  Stevedore and port

costs, such as towboat and port services, are paid by the charterer, and not by NSB

---

[29]  *See id.* at 7.

[30]  *See id.*

[31]  *See id.* at 7-8.

[32]  *Id.*

or the shipowner.[33]  None of the vessels managed by NSB were chartered to United States corporations, corporate entities, subsidiaries or agents of United States corporations.[34]

### D.   Cezary Siuta

Cezary Siuta, the Chief Mate of the Vessel, was a citizen and resident of Poland.[35]  He was employed by NSB pursuant to a contract of employment governed by German law.  The employment contract was signed and executed by Siuta in Germany.  The Estate is currently receiving the full benefits to which it is entitled under the laws of Germany as a result of Siuta's death aboard the Vessel.[36]

## III.   LEGAL STANDARD

Summary judgment is appropriate where, "viewing the record in the light most favorable to the non-moving party . . . 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"[37]  "In

---

[33]   *See id.* at 7.  An operator such as NSB pays the salaries of the crew, and pays for the cost of maintenance and repairs, food and provisions, and essential materials.  *See id.*

[34]   *See id.* at 8.

[35]   *See id.* at 22.

[36]   *See id.* at 22-23.

[37]   *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting Fed. R. Civ. P. 56(a)) (quotation marks and citation omitted).

making this determination . . . we resolve all ambiguities and draw all permissible

factual inferences in favor of the party against whom summary judgment is

sought."[38]  "A fact is material if it might affect the outcome of the suit under the

governing law, and an issue of fact is genuine if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party."[39]

"The moving party bears the burden of showing the absence of a

genuine dispute as to any material fact."[40]  To defeat a motion for summary

judgment, the non-moving party must "'do more than simply show that there is

some metaphysical doubt as to the material facts, and may not rely on conclusory

allegations or unsubstantiated speculation.'"[41]  "If the non-moving party has the

burden of proof on a specific issue, the movant may satisfy its initial burden by

demonstrating the absence of evidence in support of an essential element of the

---

[38]   *Simpson v. City of New York*, 793 F.3d 259, 265 (2d Cir. 2015) (quotation marks and citation omitted).

[39]   *Windsor v. United States*, 699 F.3d 169, 192 (2d Cir. 2012), *aff'd*, 133 S. Ct. 2675 (2013) (quotation marks, citation, and alterations omitted).

[40]   *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

[41]   *Robinson*, 781 F.3d at 44 (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)).

non-moving party's claim."[42]

"'The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists.'"[43] "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"[44]

## IV.   APPLICABLE LAW

Under the Jones Act, "[a]ny seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury."[45]  Although this language provides broad protections to seamen, it does not give rise to a cause of action by any seaman against any defendant under any circumstance.  Rather, the Jones Act is applied only if there is a substantial connection between the transaction and the

---

[42]     *Chen v. New Trend Apparel*, 8 F. Supp. 3d 406, 430 (S.D.N.Y. 2014) (citing *Celotex v. Catrett*, 477 U.S. 317, 325 (1986) (further citations omitted)).

[43]     *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (quoting *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010)).

[44]     *Crawford*, 758 F.3d at 486 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

[45]     46 U.S.C. § 688(a).

United States.[46]  That inquiry is determined by federal choice of law principles.

Thus, for example, the Jones Act has been applied to American seamen regardless of the place of injury or whether the vessel was foreign.[47] This is because "American seamen are the intended primary beneficiaries of the Act, and the United States 'has a legitimate interest that its nationals and permanent inhabitants be not maimed or disabled from self-support.'"[48]  The Jones Act has also been applied to vessels registered in America — *i.e.*, American-flagged vessels — regardless of the place of injury or the nationality of the seaman, on the ground that American registration implies consent to the Act's application.[49] However, American owners cannot avoid application of the Act by disguising themselves as foreign owners.  As explained by the Supreme Court, courts must

---

[46]    *See Lauritzen v. Larsen*, 345 U.S. 571, 578 (1953).

[47]    *See Bartholomew v. Universe Tankships, Inc.*, 263 F.2d 437 (2d Cir. 1959) (holding that Jones Act applied to United States resident who was fatally injured aboard a Liberian vessel within United States waters); *Nye v. A/S D/S Svendborg*, 358 F.Supp. 145 (S.D.N.Y. 1973), *aff'd in part*, *rev'd in part*, 501 F.2d 376 (2d Cir. 1974) (holding that the Jones Act applied to an American seaman fatally injured aboard a Danish-flag ship within Spanish territorial waters).

[48]    Symeon Symeonides, *Maritime Conflicts of Law from the Perspective of Modern Choice of Law Methodology*, 7 Mar. Law. 223, 236-37 (1982) (quoting *Lauritzen*, 345 U.S. at 586).

[49]    *See id.*; *Lauritzen*, 345 U.S. at 584 (explaining that the law of the flag is the "most venerable and universal rule of maritime law").

"press[] beyond the formalities of more or less nominal foreign registration to enforce against American shipowners the obligations which . . . [American] law places upon them."[50]

   To determine whether the Jones Act governs a case — rather than the law of a foreign jurisdiction — courts apply the choice-of-law analysis set forth in two Supreme Court cases, *Lauritzen v. Larsen* and *Hellenic Lines Ltd. v. Rhoditis*.[51]  The same analysis applies to claims under DOHSA and the general maritime law of the United States.[52]  In *Lauritzen*, the Supreme Court identified seven factors (the "*Lauritzen* factors") for determining whether the Jones Act is applicable to a seaman's claim: (1) the place of the wrongful act; (2) the law of the ship's flag; (3) the allegiance or domicile of the injured seaman; (4) the allegiance of the shipowner; (5) the place where the shipping articles were signed; (6) the

---

[50] *Lauritzen*, 345 U.S. at 587.

[51] 398 U.S. 306 (1970).

[52] *See Romero v. International Terminal Operating Co.*, 358 U.S. 354, 381 (1959) (holding that the *Lauritzen* factors applied to the determination of whether "the maritime law of the United States" may be applied); *Singh v. OMI Corp.*, No. 00 Civ. 156, 2001 WL 25701, at *1 (S.D.N.Y. Jan. 10, 2001) ("While *Lauritzen* concerned only the Jones Act, its choice-of-law principles have since been applied to DOHSA and general maritime law.") (citing *Fitzgerald v. Texaco, Inc.*, 521 F.2d 448, 454 (2d Cir. 1975)).  Accordingly, in what follows I refer exclusively to the Jones Act, but the analysis applies equally to DOHSA and the General Maritime Law of the United States.

accessibility of the foreign forum; (7) the law of the forum.[53]  In *Rhoditis*, the

Supreme Court considered an eighth factor, the shipowner's base of operations.[54]

In addition, "[t]he location of the managing and chartering agents for the vessel are

also entitled to consideration."[55]

These factors are not exhaustive, and are not meant to be applied

mechanically.[56]  Whether the Jones Act applies depends on the existence of

"substantial contacts between the transaction involved in the case and the United

States, with substantiality to be determined on an absolute scale and not by

comparing or balancing the presence of certain contacts with the absence of

others."[57]  To assess this fact, it is necessary to look beyond corporate formalities

---

[53]     *See Lauritzen*, 345 U.S. at 583-91.

[54]     *See Rhoditis*, 398 U.S. at 308-09.

[55]     *Moncada v. Lemuria Shipping Corp.*, 491 F.2d 470, 473 (2d Cir. 1974).

[56]     *See Rhoditis*, 398 U.S. at 308-09 ("The *Lauritzen* test, however, is not a mechanical one.  We indicated that the flag that a ship flies may, at times, alone be sufficient. The significance of one or more factors must be considered in light of the national interest served by the assertion of Jones Act jurisdiction.  Moreover, the list of seven factors in *Lauritzen* was not intended as exhaustive.  As . . . approved by the Court of Appeals in the present case, the shipowner's base of operations is another factor of importance in determining whether the Jones Act is applicable; and there well may be others.") (internal citations omitted).

[57]     *Moncada*, 491 F.2d at 472.

-13-

to examine the defendant's contacts with the United States.[58]

      When applying the factors, courts appear to have been guided by such underlying concerns as:  (1) avoiding an unfair competitive advantage to foreign interests at the expense of American interests that would result from allowing vessels to do business in the United States without being subject to the Jones Act; (2) avoiding retaliation against American vessels overseas that would result from applying the Jones Act to foreign vessels that did not have sufficient contacts with the United States; and (3) promoting the liberal policy of protecting seamen.[59]

## V.   DISCUSSION

      The Estate concedes that none of the *Lauritzen* factors support

---

[58]    *Rhoditis*, 398 U.S. at 310.

[59]    *Id.* ("We see no reason whatsoever to give the Jones Act a strained construction so that this alien owner, engaged in an extensive business operation in this country, may have an advantage over citizens engaged in the same business by allowing him to escape the obligations and responsibility of a Jones Act 'employer.'"); *Lauritzen*, 345 U.S. at 582 ("[I]n dealing with international commerce we cannot be unmindful of the necessity for mutual forbearance if retaliations are to be avoided; nor should we forget that any contact which we hold sufficient to warrant application of our law to a foreign transaction will logically be as strong a warrant for a foreign country to apply its law to an American transaction."); *Bartholomew*, 263 F.2d at 441 (stating that "each factor, or contact, or group of facts must be tested in the light of the underlying objective, which is to effectuate the liberal purposes of the Jones Act"); *Warn v. M/Y Maridome*, 169 F.3d 625, 628 (9th Cir. 1999), as amended (May 3, 1999) ("The question to be answered by reference to these factors is a simple one: are the United States's interests sufficiently implicated to warrant the application of United States law?").

application of the Jones Act.  Instead, the Estate argues that the Jones Act applies to its claim under the base of operations factor described in *Hellenic Lines Ltd. v. Rhoditis*.  According to the Estate, NSB's and Conti's operational business contacts with the United States are sufficient to satisfy *Rhoditis*.  These contacts are as follows: (1) NSB has a permanent office located in the United States — NSB-USA — and NSB is responsible for the operation of the Vessel; (2) forty percent of the vessels that NSB manages travel to and from United States ports; and (3) NSB offers and sells passenger cruises that start, end, and visit United States ports.

Siuta was neither an American national nor a domiciliary and his death occurred in foreign waters.  NSB and Conti are not *nominal* foreign companies, they *are* foreign companies.  American citizens do not own stock in the Petitioners.  None of Petitioners' owners or directors reside in or are citizens of the United States, and with the possible exception of Lyborg, the principal of NSB-USA, the same is true of Petitioners' officers.  Neither NSB nor Conti pay corporate or income taxes to any United States agency.  Other than NSB-USA, neither NSB nor Conti has offices or a subsidiary in the United States.  None of the vessels NSB manages are registered in the United States.  Furthermore, the Vessel's charterer, MSC, is also a foreign company.

-15-

This is simply not a case where "the facade of the operation must be considered as minor, compared with the real nature of the operation and a cold objective look at the actual operational contacts that this ship and this owner have with the United States."[60]  The Estate does not even attempt to argue that either Conti (the owner) or MSC (the charterer) have a base of operations in the United States.  In the main, the Estate's arguments relate to NSB, the Vessel's operator.  This argument rests primarily on the agency relationship between NSB-USA and NSB, the operational support NSB provides to ships that frequent United States ports, and the fact that NSB offers and sells passenger cruises that start, end, and visit United States ports.[61]  However, whether taken separately or in the aggregate, and resolving all fact disputes in the Estate's favor, NSB's contacts with the United States are not sufficient to warrant application of the Jones Act.

The Estate has not cited to a single case that supports application of the Jones Act based on these sorts of contacts, and the Estate's position is not supported by the case law.  In *Rhoditis*, the injury occurred on United States waters, the shipowner had its largest office in New York and a second office in

---

[60]     *Rhoditis*, 398 U.S. at 310.

[61]     It is undisputed that NSB receives less than one percent of its gross income from passenger cruises, and I therefore find that this income is of minimal importance.

New Orleans, and more than ninety-five percent of its stock was owned by a United States domiciliary who resided in Connecticut and had been in the United States for twenty-five years.  This United States domiciliary also managed the corporation out of New York.[62]  There are no meaningful parallels here to the facts in *Rhoditis*.  Likewise, the cases relied on by the Estate demonstrate that the contacts of NSB-USA are insufficient to establish a base of operations in the United States.  In *Williams v. Cruise Ships Catering* — as in *Rhoditis* — it was American *ownership*, taken together with other factors, that led to a finding of substantial contacts.[63]  And in *Fantome, S.A. v. Frederick*, the shipowner's operations in the United States were far more extensive than here, because "the corporate operations of the entire [ ] Fleet [of the shipowner was] based in Miami

---

[62]    *See id.* at 307-08.

[63]    *See* 299 F. Supp. 2d 1273, 1283 (S.D. Fla. 2003) (holding that the "[t]he key link to the United States [was] that Carnival, a Florida corporation, with its principal place of business in Miami, is the principal shareholder (99%) of the parent company, Costa Crociere, who, in turn, is the principal shareholder of the remaining defendants").  *But see Membreno v. Costa Crociere S.p.A.*, 425 F.3d 932, 937 (11th Cir. 2005) (holding that shipowner ("Costa") was not subject to the Jones Act despite the fact that it was a fully owned one-hundred percent subsidiary of an American corporation, explaining that "[al]though Costa markets some of its cruises in the United States, 80 to 85% of its business comes from the European market.  Only a small number of Costa's cruises originate from or call at American ports. During the relevant period, Costa's fleet spent only 3.4% of its sailing days at American ports. Costa maintains a United States subsidiary, Costa Cruise Lines, N.V., that markets and sells passenger tickets in the United States, but that subsidiary is just one of eight separate companies that markets Costa cruises.").

-17-

Beach."[64]

      There is no doubt that "earn[ing] substantial income from cargo originating in or bound for the United States . . . is an important consideration in determining whether the foreign defendants should be deemed to be in competition with American shippers."[65]  It is therefore relevant that forty percent of NSB's business consists of NSB vessels traveling to and from United States ports and that the Vessel itself visited United States ports about twice a month from 2006 to

---

[64]    No. 02-10890, 2003 WL 23009844, at *4 (11th Cir. Jan. 24, 2003) ("It was there that the advertising, reservations and sales of Windjammer cruises took place, and that the supply company, purchasing agent, and ticketing agent for all of the crew and passengers were located.  All of the FANTOME's disbursements, payments, payroll, and other expenses were drawn from Windjammer bank accounts, located in Miami Beach.  It was in the Miami Beach headquarters that all decisions regarding the ship's itineraries were made and where coordination of the ship's repairs, inspections, and supervision took place. Finally, all of the communications equipment used to interface with the ship was located in Miami Beach. Nowhere in the record is it suggested that these activities were carried out in any foreign country.  Moreover, it does not appear that Windjammer had any agents located in foreign countries.  Every decision that was not made on the ship appears to have been made at the Miami Beach headquarters.").  The Estate also relies on *Szumlicz v. Norwegian Am. Line, Inc.*, 698 F.2d 1192, 1194 (11th Cir. 1983), in which the court merely states without elaboration that "[t]he defendant maintains offices in Fort Lauderdale, Florida, and in New York, New York."

[65]    *Karvelis v. Constellation Lines SA*, 608 F. Supp. 966, 969 (S.D.N.Y. 1985), *aff'd*, 806 F.2d 49 (2d Cir. 1986).

2012.[66]  Yet contacts with United States ports without more has never been

sufficient to satisfy the choice of law analysis.[67]  As explained in *Lauritzen*:

> Respondent places great stress upon the assertion that petitioner's commerce and contacts with the ports of the United States are frequent and regular, as the basis for applying our statutes to incidents aboard his ships. But the virtue and utility of sea-borne commerce lies in its frequent and important contacts with more than one country. If, to serve some immediate interest, the courts of each were to exploit every such contact to the limit of its power, it is not difficult to see that a multiplicity of conflicting and overlapping burdens would blight international carriage by sea.[68]

The problem for the Estate is that NSB's and the Vessel's connections

to United States ports, NSB's foothold in the United States from NSB-USA, and

the revenue it derives from its cruise operations do not, when taken together,

---

[66]     *See* Estate Opp. at 10-17.  When a "foreign vessel is more than a casual visitor of American ports" it establishes connections to the United States, competes with American shippers, and, because the vessel is a frequent visitor, a defendant cannot argue that application of the Jones Act would constitute an "unfair surprise."  *Symeonides*, Maritime Conflicts, 7 Mar. Law. at 254.

[67]     *See, e.g.*, *Gutierrez v. Diana Investments Corp.*, 946 F.2d 455, 457 (6th Cir. 1991) ("It cannot be gainsaid that the facts here are considerably different than in *Rhoditis*.  To start with, the injury itself did not take place in a United States port or even in United States waters.  As far as having substantial contacts with the United States is concerned, we do not purport to reduce this test to a percentage formula.  All we decide here is that, where none of the seven Lauritzen factors weigh in favor of the plaintiff, the fact that this ship did 20 percent of its business in United States ports will not tip the scales in favor of jurisdiction.").

[68]     345 U.S. at 581.

-19-

amount to substantial contacts.  For example, the Estate relies on *Moncada v. Lemuria Shipping Corp.* for support because in that case, as here, forty percent of the vessel's voyages began or ended in American ports.[69]  But that is where the similarity ends.  In holding that the Jones Act applied, the Second Circuit explained that "[o]f the contacts favoring the plaintiff in the present case, the most important is that all of the stock of all the defendants was owned by Americans" and went on to find that "defendants [had] their base of operations in [America] and the managing and chartering of the vessel [was] conducted from [America.]"[70]  It was only then that the court cited to the forty percent figure as another relevant factor.

*Karvelis v. Constellation Lines* is also not helpful to the Estate.  While none of the defendants in *Karvelis* were owned by Americans, the ship earned *one-hundred percent* of its revenue from trips to and from the United States.[71]  There are other important differences between that case and the present case.

> Moreover, [the owners of the shipowner and the charterer,] Sofianapoulos, Vlachos and Spyrakos[,] have some direct involvement in the management of business ventures from American shores.  During 1983 and 1984, Spyrakos and Vlachos

---

[69]     *See* 491 F.2d at 473.

[70]     *Id.*

[71]     *See Karvelis*, 608 F. Supp. at 969-70.

would come to the United States twice annually on business, and would work out of [the agent's] New York offices. Sofianapoulos would come to this country, too, about once a year. In addition, the three men own part of two shipping-related corporations in the United States. Pursuant to an agreement with Navigation, Sofianapoulos, Vlachos and Spyrakos could designate an entity to own 50 percent of three South Carolina corporations located in Charleston, S.C. — Wando Stevedoring Co., Inc., Trident Shipping Agency, and Romney Realty. Akti Shipping and Investment SA, a Panamanian corporation, was [so] named. (Under the agreement, Navigation owned the other 50 percent of the South Carolina corporations). Though the precise extent of Sofianapoulos', Vlachos', and Spyrakos' ownership interest in Akti is not clear, defendants have conceded that the three are shareholders. Moreover, it is undisputed that Spyrakos is a director of Wando and Trident (though defendants claim that Spyrakos is not deeply involved, and is a director in name only). Trident is [the agent's] Charleston sub-agent, and Wando performs stevedoring services for [the charter's] vessels, including the Enterprise. Trident and Wando rent their office space from Romney Realty.[72]

Finally, *Karevelis* is distinguishable on the additional ground that the injury occurred in New Jersey.[73] At most, the cases relied on by the Estate stand for the

---

[72]    *Id.* at 970.

[73]    In addition, the Estate fails to address adequately the argument raised by Petitioners that under the various charter agreements in place, neither NSB nor Conti controlled the destination of the Vessel. *See Matute v. Procoast Nav., Ltd.*, No. 88 Civ. 2710, 1989 WL 223271 (D.N.J. Nov. 30, 1989), *aff'd*, 928 F.2d 627 (3d Cir. 1991) ("While it may be true that the entity which chartered . . . the vessel derived a substantial profit from the vessel's cargo operations originating out of Port Newark, the owner did not. As the owner of the vessel, Procoast was entitled to receive income from the leasing of the vessel no matter where it docked or did its business. Thus, by so chartering the vessel, Procoast did not necessarily subject itself to the jurisdiction of every country at which the vessel docked or did

-21-

proposition that earning significant revenue from the United States, together with

the presence of other factors, supports application of the Jones Act.[74]

As the Estate concedes, application of the Jones Act is not supported

by any of the seven *Lauritizen* factors.  It is also undisputed that the Estate is

_____

business.") (citing *Laurtizen*, 345 U.S. at 581); *Ullah v. Canion Shipping Co.*, 589 F. Supp. 552 (D. Md. 1984), *aff'd*, 755 F.2d 1116 (4th Cir. 1985) ("[T]his Court will give little weight to the fact that, during the time that Canion owned the vessel, 20% of its calls were made to ports in the United States.  Even less weight will be given to the fact that substantial sums were paid as freight for loading and unloading Idaho's cargoes in Baltimore and in other ports.  Freight paid to the charterer was not income to Canion, which received hire payments whatever cargo was carried and wherever the vessel went.  Since the vessel was time-chartered, the decision as to the ports of call for its voyages was made by Idaho, the time charterer.  But Idaho is no longer a party to this action. Whether or not the amount of freight paid would be relevant in deciding if the Jones Act should be applied to a charterer-employer, it has little relevance insofar as the shipowner itself is concerned where the vessel is subject to a time-charter. As the owner of a chartered vessel, Canion was not engaged in any particular trade of its own choosing but was obligated to sail the vessel to those ports selected by the time-charterer.").  *See also Porina v. Marward Shipping Co.*, 521 F.3d 122, 128 (2d Cir. 2008) (noting in the context of personal jurisdiction analysis that "[t]he decision to bring the [ship] to the United States was made, in each case, by the ship's charterers, who were free under the charters to take the ship to any safe port in the world. The unilateral activities of third parties — here, the charterers — cannot, in themselves, satisfy the requirement of contact with the forum.").

[74]     *See Fisher v. Agios Nicolaos V*, 628 F.2d 308, 317 (5th Cir. 1980) *overruled by In re Air Crash Disaster Near New Orleans, La.* on July 9, 1982, 821 F.2d 1147 (5th Cir. 1987) (holding that the Jones Act applied where "the vessel's entire service under its present ownership, and its entire revenues therefore to be earned, arose from a base of operations in the United States"); *Karvelis*, 608 F. Supp. at 969-70 (holding that Jones Act applied where, among other things, one-hundred percent of revenue was derived from cargo either originating or bound for the United States).

receiving the full benefits to which it is entitled under the laws of Germany.

Having reviewed the case law and the record, and resolving all actual factual

disputes in favor of the Estate, I conclude that there is no substantial contact

between the transaction here at issue and the United States.[75]  Under the

circumstances of this case, the interests of the United States have not been

sufficiently implicated to warrant the application of United States law.

## VI.   CONCLUSION

        For the foregoing reasons, Petitioners' motion for summary judgment

is GRANTED.  The Clerk of the Court is directed to close this motion [Dkt. No.

831].

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
        April 27, 2016

---

[75]    I also reject the Estate's argument that judicial estoppel applies to Petitioners' motion based on their attempt to limit liability under section 30511. The Estate has offered no support for this argument.

-23-

**-Appearances-**

**For Iwona Siuta:**

Carlos Felipe Llinas Negret, Esq.
Lipcon, Margulies, Alsina & Winkleman, P.A.
One Biscayne Tower, Suite 1776
Miami, Florida 33131

**For Conti 11. Container Schiffahrts-Gmbh & Co. KG and NSB Niederelbe Schiffahrtsgesselschaft MBH & Co. KG**

James E. Ryan, Esq.
Dougherty, Ryan, Giuffra, Zambito & Hession
250 Park Avenue
Seventh Floor
New York, New York 10177