# MONTGOMERY McCRACKEN
ATTORNEYS AT LAW

**Eugene J. O'Connor**

Admitted in New York

437 Madison Avenue
New York, NY 10022
Tel: 212-867-9500

Direct Dial: 212-551-7734
Fax: 212-201-1931
Email: eoconnor@mmwr.com

August 24, 2018

Hon. Katherine B. Forrest
United States District Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street, Room 2230
New York, NY 10007

      Re:    *In re M/V MSC FLAMINIA* – Master File: SDNY No. 12 Civ. 8892 (KBF)

Dear Judge Forrest,

    We are the attorneys for Conti 11. Container Schiffahrts-GMBH & Co. KG MSC "FLAMINIA" ("Conti") and NSB Niederelbe Schiffahrtsgesellschaft MBH & Co. KG ("NSB"), who are the owner and operator of the M/V MSC FLAMINIA and the Plaintiffs in the above-referenced Limitation action.

    At the August 10, 2018 Pre-Trial Conference, Your Honor invited the parties to submit short letters to call attention to evidence that the parties believe is significant.[1] In this letter, Plaintiffs discuss: (1) the ventilation of Cargo Hold No. 4 of the M/V MSC FLAMINIA; and (2) the temperature in Cargo Hold No. 4 of the M/V MSC FLAMINIA.

---

[1] Pre-Trial Conference (August 10, 2018) Tr. P.33 L: 11 – P. 34 L:22.

Montgomery McCracken Walker & Rhoads LLP

August 24, 2018
Page 2

**1.     Mechanical ventilation of Hold No. 4 was not required or requested**

Mr. Eckart Moeller[2] testified that NSB left the decision to ventilate cargo holds to the cargo officer, usually the Chief Officer, on each vessel. In the case of the MSC FLAMINIA, Chief Officer Siuta was responsible for deciding when to leave the natural ventilation vents open and when to run the mechanical exhaust ventilation fans.[3] This is a standard industry practice on containerships.[4]

Mr. Moeller went on to explain that, in 2012, NSB had 95 containerships under management, and these ships operated all over the world, in various climates, and year round.[5] NSB did not have a standing instruction requiring when to ventilate (or not) cargo holds to avoid the possible buildup of moisture.[6] The decision to ventilate would be for the cargo officer, i.e., Chief Officer, to make based on his or her professional judgment.[7] At trial, Mr. Moeller clarified that the only requirements with respect to operating the mechanical ventilation in cargo holds is to simply follow what provided for by the IMDG Code.[8]

Stolt's expert James Dolan testified during the Phase 1 Trial that, aside from dangerous cargo regulations in SOLAS, i.e., the IMDG Code, there is no regulation that requires when a cargo hold needs to be ventilated, and that the decision as to whether to ventilate is, in practice, left to the judgment of the Chief Officer.[9]

---

[2] M. Eckart Moeller began his maritime career in 1993, starting as an apprentice ship's mechanic, rising through the deck officer ranks to Chief Officer / cargo officer and finishing as a Captain on containerships. Moeller Trial Declaration (Docket #1471) at P. 1 at ¶¶3-6. Transferring to NSB's shore-side operations, Mr. Moeller held the positions of Nautical Superintendent responsible for the navigational concerns of 23 containerships, then Fleet Manager in charge of the operation of 23 containerships, and finally as Nautical Director in charge of all of NSB-managed containerships. Moeller Trial Declaration (Docket #1471) at P. 2 at ¶¶7-10. Through weekly meetings with the heads of NSB departments and active membership in the German Shipowners Association, Mr. Moeller gained industry-wide knowledge of standard practices on board containerships. E. Moeller Phase 2 Trial Testimony, Tr. P. 1447 L:18 – P. 1448 L:9; Declaration of Eckart Moeller In Response to Stolt's Motion *in Limine* (Docket #1525).

[3] Moeller Trial Declaration (Docket #1471) at P. 20 at ¶84.

[4] Moeller Trial Declaration (Docket #1471) at P. 20 at ¶84.

[5] Moeller Trial Declaration (Docket #1471) at P. 20 at ¶85.

[6] Moeller Trial Declaration (Docket #1471) at P. 20 at ¶85.

[7] Moeller Trial Declaration (Docket #1471) at P. 20 at ¶85.

[8] E. Moeller Phase 2 Trial Testimony, Tr. 1424 L: 3-13).

[9] J. Dolan Phase 1 Trial Testimony, Tr. P. 193 L: 23 – P. 194 L: 6; P. 194 L: 22-25.

Montgomery McCracken Walker & Rhoads LLP

August 24, 2018
Page 3

      According to NSB's Insurance Department and NSB's insurance provider, there have not been any cargo or hull claims for moisture damage due to lack of ventilation within the cargo holds of the MSC FLAMINIA or any other NSB managed containership.[10] Likewise, NSB has not received any complaints for damage caused by moisture within the cargo holds of any of the NSB-managed vessels. This includes the MSC FLAMINIA and other vessels on which Chief Officer Siuta sailed and voyages in the summer from the United States to Northern Europe.[11]

      Furthermore, Mr. Moeller testified that NSB would have honored a request to ventilate a cargo, had such request been received from the shipper via MSC.[12] However, NSB was not informed that Deltech's cargo required ventilation.[13] At trail, Deltech witnesses testified that Deltech did not request that the DVB cargo be ventilated.[14] In fact, neither Deltech nor Stolt had any direct communication with Conti, NSB, or the MSC FLAMINIA.[15]

      Accordingly, a decision by Chief Officer Siuta to not ventilate Cargo Hold No. 4 of the MSC FLAMINIA would have been within his discretion and proper.[16]

---

[10] Moeller Trial Declaration (Docket #1471) at P. 21 at ¶87.

[11] Moeller Trial Declaration (Docket #1471) at P. 21 at ¶87.

[12] E. Moeller Phase 2 Trial Testimony, Tr. 1425 L: 2-6; Moeller Trial Declaration (Docket #1471) at P. 20 at ¶86.

[13] Moeller Trial Declaration (Docket #1471) at P. 20 at ¶86.

[14] E. Elefante Phase 2 Trial Testimony, Tr. P. 184 L: 3-13; Z. Levine Phase 2 Trial Testimony, Tr. P. 512 L: 22-25; 550 L: 18-22.

[15] A. Morton Phase 2 Trial Testimony, Tr. P. 608 L: 16 - P. 609 L: 5; A. Smith Phase 2 Trial Testimony, Tr. P. 713 L: 14-25; J. Cario Phase 2 Trial Testimony, Tr. P. 809 L: 20 – P. 810 L: 4; W. Sikma Phase 2 Trial Testimony, Tr. P. 1000 L: 6-22.

[16] Moeller Trial Declaration (Docket #1471) at P. 21 at ¶88.

### 2. The Temperature in Hold No. 4 was within the expected range

The ventilation system of the cargo hold is not intended or designed to reduce heat or maintain the temperature of the cargo hold.[17] The temperature of the cargo hold on a containership is controlled by the temperature of the cargo loaded into the hold and the ambient temperature outside the vessel.[18] If the cargo loaded into the cargo hold is warm, then the cargo hold temperature can remain warm even though the vessel sails to a cooler environment.[19] This can be the case even if the ventilation vents are all open and the exhaust fans are on.[20] When the loaded cargo naturally cools over time, then the cargo hold temperature can be expected to increase and decrease with changes in the ambient temperature outside the vessel.[21]

Mr. Eckart Moeller testified that, under these circumstances, the cargo hold temperature would normally be somewhat hotter than the ambient temperature outside the vessel.[22] More importantly, if a shipper or charterer required that a specific temperature, or range of temperatures, be maintained for its containerized cargo, then the cargo should be shipped in a temperature controlled (i.e. refrigerated or "reefer") container.[23]

Stolt's expert Mr. Dolan testified at trial that he expected the temperature of Cargo Hold No. 4 of the M/V MSC FLAMINIA to be slightly above 38 °C (100 °F) in the absence of mechanical ventilation.[24]

---

[17] Moeller Trial Declaration (Docket #1471) at P. 21 at ¶89; J. Dolan Phase 1 Trial Testimony, Tr. P:194 L: 13-16.

[18] Moeller Trial Declaration (Docket #1471) at P. 21 at ¶90; Robbins Trial Declaration (Docket #1301) at P. 37 at ¶89.

[19] Moeller Trial Declaration (Docket #1471) at P. 21 at ¶91; Robbins Trial Declaration (Docket #1301) at P. 37-40 at ¶86-89.

[20] Moeller Trial Declaration (Docket #1471) at P. 21 at ¶91.

[21] Moeller Trial Declaration (Docket #1471) at P. 21 at ¶91.

[22] Moeller Trial Declaration (Docket #1471) at P. 22 at ¶93.

[23] Moeller Trial Declaration (Docket #1471) at P. 22 at ¶94.

[24] J. Dolan Phase 1 Trial Testimony, Tr. P. 201 L: 19 – P. 202 L: 8.

Tom LeBlanc, Vice-President and General Manager at Deltech, testified at his deposition that, on the basis of data gathered by Deltech in ocean voyages via data loggers placed inside the containers, he expected the temperature in Hold No. 4 to be between 30 and 40 °C (, with 40 °C being on the high end.[25]

Deltech's Zack Levine also had an idea about what temperatures might be like in a containership cargo hold, but he was wrong. Like Mr. LeBlanc, Mr. Levine also explained that Deltech was able to find a single ocean carrier to assist with a temperature monitoring study.[26] The resulting data was compiled by Travis Johnson into a spreadsheet and was marked as DTX-275.[27] At trial, Mr. Levine confirmed that he was unaware of any temperature study other than the one reflected in DTX-275.[28] Presumably Mr. Levine was referring to the same one referenced by Mr. LeBlanc, since Mr. Levine was only aware of one having been done and both gentlemen describe their referenced temperature study as having been done in the same time period for Deltech shipments to China, India, and Europe.[29] A closer look at the data itself reveals a very important detail – the temperature of the Deltech cargo is measured, but there is no recorded temperature of the cargo hold of the respective containership over time.[30] Mr. Levine testified at trial that he did not receive the actual temperature reports from at sea, so his knowledge about temperatures during transportation is limited to the study, which doesn't include the temperature over time in the cargo hold of a containership.[31] As such, Mr. Levine had no basis to even hazard a guess as to what temperature might be expected in a containership cargo hold.

Estimates are one thing, but experts have considered and calculated the temperatures of containership cargo holds. For instance, in the *DG Harmony*, containership cargo hold temperatures in the range of 35 °C (95 °F) to 40 °C (104 °F) were found to be normal and expected.[32]

---

[25] LeBlanc Deposition Tr. P. 247 L: 18 - 248 L: 7.

[26] Levine Trial Declaration (Docket #1491) at P. 11-12 at ¶41.

[27] Levine Trial Declaration (Docket #1491) at P. 11-12 at ¶41, fn 6.

[28] Z. Levine Phase 2 Trial Testimony, Tr. P. 385 L:9 – P. 386 L:5.

[29] LeBlanc Deposition Tr. P. 247 L:18 – P. 251 L:3

[30] DTX-275 – Deltech temperature study for cargo shipped to China, India, and Europe.

[31] Z. Levine Phase 2 Trial Testimony, Tr. P. 385 L:9-11.

[32] *In re DG HARMONY*, 533 F.3d 83, 96 (2d Cir. 2008), *quoting In re DG HARMONY*, 394 F.Supp.2d 649, 661 and 670 (SDNY 2005) ("The temperature of the third hold… ranged from approximately 35 °C to approximately 40 °C" which were " 'normal and expected' ambient temperatures in the third hold"); Dolan trial testimony - Trial Tr. P:201
Continued…

In this case, all experts agreed that Cargo Hold No. 4 would have been a few degrees warmer than the ambient temperature outside air.[33] Specifically, Deltech and Stolt's expert Dr. Davis predicted the MSC FLAMINIA Cargo Hold No. 4 ambient temperature to be as high as 32.6 °C (90.7 °F) during the voyage with no mechanical ventilation running.[34] In her trial declaration, Deltech's expert Prof. Kaminski stated that she considered the temperature of 31°C (87.8°F) a "conservatively high but fair estimation of the cargo hold 4 air temperature on the Flaminia during the incident voyage."[35]

To put this in perspective, the IMDG Code cautions that cargo on board a ship can be exposed to temperatures as high as 55°C (131°F) for short periods of time during each 24 hour period.[36]  For this reason, Mr. Downey testified at trial that MSC would not take the temperature of a cargo hold into consideration when planning stowage.[37]  In essence, the IMDG Code, as a system, already contemplates the temperature that cargo could be exposed to on a ship, including in a cargo hold. As it turns out, the hold temperatures calculated by the experts in this case are well below 55°C (131°F).

---

….Continued

L: 19-24 (Q:"…you would not expect the temperature in No. 4 hold to have exceeded 38 degrees C with mechanical ventilation on, is that right?" A. "Yes." Q. "And if the ventilation was shut down, your testimony was that the 38 degree C level would be slightly higher?" A. "Yeah.  I didn't quantify whether and how much higher because I don't know.").

[33] Robbins Trial Decl. (Docket #1301) pgs. 37-40 at ¶¶85-89; Kaminski Trial Decl. (Docket #1303) pg. 25 at ¶1 and pg. 30 at ¶¶17-21; Davis Trial Decl. (Docket #1304) pg. 91 at ¶42; Dolan Trial Decl. (Docket #1288) pg. 7 at ¶30.

[34] Davis Trial Declaration (Docket #1304) at pg. 90, ¶41; Robbins Trial Declaration (Docket #1301) at pg. 37-40, ¶¶ 85-89.

[35] Kaminski Phase 1 Trial Declaration (Docket # 1303) at P. 25 ¶1 and P. 30 ¶¶ 19 and 21 (agreeing with the cargo hold temperature estimated by Mr. Robbins which was based on a full scale temperature study conducted on the MSC FLAMINIA in 2015.

[36] International Maritime Dangerous Goods (IMDG) Code, Chapter 7.7 – Temperature control provisions at ¶¶ 7.7.1.2 - 7.7.1.3 ("The provisions for the temperature control of certain specified substances are based on the assumption that the temperature in the immediate surroundings of the cargo does not exceed 55°C during transport and attains this value for a relatively short time only during each period of 24 hours.  **If a substance which is not normally temperature-controlled is transported under conditions where the temperature may exceed 55°C, it may require temperature control; in such cases, adequate measures shall be taken.**"(emphasis added)).

[37] (Downey Phase 2 Trial Testimony, Tr. P. 1194 L: 8-12).  (Downey Phase 2 Trial Testimony, Tr. P. 1193 L: 14 – P. 1194 L: 7; see IMDG Code, Sect. 7.7.1.2)

Montgomery McCracken Walker & Rhoads LLP

August 24, 2018
Page 7

In short, the ambient temperature in Cargo Hold No. 4 of the MSC FLAMINIA was within the expected range of temperatures for a containership sailing through Southern US ports in the summer. The reasonable expectations of Mr. Dolan and Mr. LeBlanc actually envisioned temperatures for Cargo Hold No. 4 hold much higher than the 32.6 °C (90.7°F) calculated by Dr. Davis.

In conclusion, Plaintiffs respectfully submit that:

a) Deltech did not request that the ventilation be turned on for the hold in which DVB was stowed;

b) The decision of the Chief Officer not to ventilate Cargo Hold No. 4 was reasonable and not negligent because it was consistent with industry practice and no party had requested ventilation; and

c) The temperature in Hold No. 4 was within the expected range of temperatures for a containership sailing through Southern US ports in the summer.

Respectfully submitted,

MONTGOMERY MCCRACKEN
WALKER & RHOADS, LLP

*/s/ Eugene J. O'Connor*

Eugene J. O'Connor
Timothy Semenoro