# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE COMPLAINT OF CONTI 11.CONTAINER SCHIFFAHRTS – GMBH & CO. KG MS "MSC FLAMINIA," AS OWNER, AND NSB NIEDERELBE SCHIFFAHRTSGESELLSCHAFT MBH & CO. KG, AS OPERATOR, OF THE MSC FLAMINIA FOR EXONERATION FROM LIMITATION OF LIABILITY : : : : : : : : : : : : | **MASTER FILE 12 CV 8892 (KBF)** |

_____

## BPD SUPPLEMENTAL FINDINGS OF FACT

109.    Deltech was involved in investigating the effect of temperature on the DVB during transit. Deltech wanted to have temperature monitoring of DVB while on ocean transit. This was an evolutionary process. (Elefante Decl. ¶¶ 39-43).

110.    As a result of this evolutionary process, Mr. Elefante stated that the fact that Deltech could not obtain temperature monitoring "was not a concern for us because we found the temperature exposure while at sea was consistently relatively low. This is why the recommendation for onboard temperature monitoring does not appear [on] any of Deltech's later shipping guidelines[.]" (Elefante Decl. ¶ 51; Levine Decl. ¶¶ 71-72, 80).

111.    Deltech had abandoned temperature monitoring at sea as it no longer had any reason to request stowage on deck or concerns about stowage below deck. (LeBlanc Dep. Trans. 197:18-198:22).

112. At the time of the FLAMINIA incident, the operative version of Deltech's DVB shipping guidelines were Revision 3 and dated June 2, 2011. (DTX-0344; Elefante Decl. ¶ 60).

113. The DVB shipping guidelines did not include any requirement that Deltech or Deltech's NVOCCs "obtain or perform on-vessel temperature monitoring." (Elefante Decl. ¶ 63). Temperature monitoring was not necessary to obtain safe delivery of DVB. (Levine Decl. ¶¶ 80, 83).

114. Mr. Levine testified that between 2007 and prior to the FLAMINIA and at the time the FLAMINIA shipments were booked, Deltech had not received any reports of on board temperature monitoring for DVB shipments. (Levine Tr. 387:5-23).

115. Mr. Levine testified that given Deltech's experience with temperature monitoring at the time of the FLAMINIA DVB shipment, Deltech did not expect on board temperature monitoring. (*Id.* at 390:9-15).

116. Despite the fact that Deltech was not expecting any on board temperature monitoring at sea, and had stopped requesting stowage above deck as reflected by the removal of this instruction from its booking request form, the "stow above deck for temperature monitoring" language remained as a holdover on the template that Deltech used to generate the shipper's letter of instruction that it sent to Panalpina for preparing bills of lading for the ocean carraige of its DVB shipments. (Galloway Dep. Tr. 36:5-7; 122:7-123:13).

117. In exhibit DTX-0360, when asked a question about what Tatonya Johnson meant on the first line under the address, just below the office telephone number which said "please secure a booking with temperature monitoring to load DVBS-80 for Deltech Corp. . . ." Ms. Johnson testified that by that, she meant to check the temperatures before the DVB was loaded onto the vessel. (Johnson Tr. 263:15-23).

118. Ms. Johnson expected the temperature of DVB to be checked "prior to loading from the dock." (*Id.* at 264:12-15).

119. Ms. Johnson expected Stolt to check the temperature gage. (*Id.* at 266:18-24).

120. Ms. Johnson expected someone from Stolt to check the temperature and Skip Smith never told her that they did not check the temperature gages. (*Id.* at 267:6-14).

121. In a question and answer session with the Court, Ms. Johnson stated that pursuant to conversations she had with Skip Smith, it was agreed that Stolt would check – that it was imperative for Deltech to check the temperature of the container prior to it loading. She said that "Skip did agree that they would check the temperature gage prior to its shipping." In response to the Court's statement of "[i]n connection with your conversation with Stolt, which you had primarily through Mr. Skip Smith, Stolt agreed that they insure that the temperature gages were checked prior to the ISO containers being loaded onto the ship." – Ms. Johnson responded, "Yes ma'am." (*Id.* at 267:21-268:2).

122. Thus, at the time of the subject DVB shipments, Deltech was actively issuing instructions allowing its DVB shipments to be stowed below deck, and considered below deck stowage to be completely acceptable. (LeBlanc Dep. Tr. 197:15-25; 198:2-22).

123. Albert Smith, the regional sales manager with Stolt that handled the Stolt account, testified that Stolt's service quote for services with Deltech never included "routine temperature monitoring." (Smith Decl. ¶¶ 46, 47, 62, 69, 70).

124. The agreement between Stolt and a customer is known as a rate quote and it contained all the agreed upon services for the movement of an ISO tank container for a customer's specific product. The rate quote includes pricing for trucking, rail, ocean transport, and any special services. Once there is an agreement between Stolt's customer and Stolt's sales

representative, the rate quote is entered into the AS-400 computer system and is used by the operators when the customer requests a shipment. (Morton Decl. ¶ 15).

125. Any special services between Stolt and the customer would be in the rate quote and set forth in the "note" field. That note field is automatically copied to the electronic move file covered by the booker. (*Id.*). If there is no rate quote in the system, there cannot be any shipment. (*Id.* at ¶ 16).

126. The agreement between Stolt and Deltech is reflected in Stolt's General Terms and Conditions. (PX-309). As set forth therein, Stolt

> is at liberty to choose how it may perform the Services and shall have choice over the use of any subcontractors and carrying vessel in the performance of the whole or any part of the contractual Services. Unless the Customer has requested otherwise [Stolt] books the cargo without special stowage or handling instructions.
>
> (PX-309, § 4.2).

Section 2.2 of the General Terms and Conditions states:

> The Customer's terms and conditions shall not prevail in the event of any conflict with [Stolt's] terms, and or the [Stolt] Combined Transport Bill of Lading. These Terms form a part of the "Carrier's Tariff" where such term is used in any Combined Transport Bill of Lading issued by [Stolt].
>
> (*Id.* at § 2.2).

The Combined Transport Bill of Lading in turn provides in Section 2.3.2:

> <u>Containers, whether stowed by the Carrier or received by him in stowed condition from the Merchant, may be carried on or under deck without notice to the Merchant</u>. [emphasis added]
>
> (PX-363, § 2.3.2).

127. Stolt's regional manager, William Sikma, testified the rate quote is the foundation of the global accounting system and governs the shipment of an ISO tank container for a customer. (Sikma Decl. ¶ 26).

128. Mr. Sikma also testified that no temperature monitoring services were contained in any rate quote relating to any Deltech move. (*Id.* at ¶ 38).

129. As such, since no temperature monitoring was being done, Stolt did not report any temperatures as stated in the form booking request from Deltech. (*Id.* at ¶ 39).

130. Consequently, there was no mutual intent between Deltech and Stolt for Stolt to provide on board temperature monitoring of the DVB cargo.

131. Janet Johnston, a Stolt customer representative, negotiated and signed the service agreement with MSC USA that was applicable in June/July 2012. The service contract did not contain any terms or provisions for temperature monitoring. (Johnson Stip. Dkt. 1556).[1]

132. MSC has had a service contract with Stolt-US. (Johnson Decl. ¶ 26, Stip. Dkt. 1556). The subject DVB shipments were booked pursuant to this Service Contract. (Johnson Decl. ¶¶ 25-26; DTX-0468).

133. MSC issued sea waybills with respect to the subject DVB shipments. The terms and conditions of MSC's form of sea waybill (U.S. Edition – 08/2009) were incorporated into the Service Contract by reference (DTX-0468, Clause 5(a)), and Stolt agreed in the Service Contract to abide by the sea waybill provision. (DTX-0468, Clause 9(a) and 9(d)). These terms and conditions are PX-254, and the provisions are readily available on MSC's website. (Bozzo Decl. ¶ 45; PX-258).

134. Clause 9 of the Service Contract, titled "PROVISIONS/NOTES/EXCEPTIONS", subheading (a), expressly authorized the issuance of sea waybills instead of bills of lading for the contract of carriage of cargo. (DTX-0468, Clause 9(a)).

---

[1] A typographical error resulted in the mislabeling of Ms. Johnston's exhibits as "Johnson" rather than "Johnston."

135. The Service Contract provided in Clause 5(a) that "[i]n addition to the rate stated in this Contract, shipments made hereunder shall be subject to the . . . terms and conditions of Carrier's bill of lading or sea waybill, as the case may be, and all said provisions are hereby incorporated in this Contract by reference." (DTX-0468, Clause 5(a)).

136. Mr. Herrera of MSC handled bookings for the Stolt account. (Herrera Decl. ¶ 8).

137. When Erin Bruening called to book the DVB containers for shipment on an MSC vessel, she never requested any special stowage or segregation or handling instructions. (*Id.* at ¶ 43).

138. If Ms. Bruening had made a request for such instructions, he would have passed it to his supervisor, to the relevant line manager, and to the Charleston hazardous department. (*Id.* at ¶ 44).

139. The process of preparing bill of lading documentation involves Deltech providing its shipper's letter of instruction to its freight forwarder, Panalpina, who, in turn, prepares the U.S. customs related paperwork and master bill of lading instructions to be sent to BDP (Stolt's documentation department) (Vincent Tr. 20:11-28:16). BDP, in turn, relies on the Panalpina document to prepare a Stolt house bill of lading, as well as master bill of lading instructions it sends to MSC USA's Documentation department for preparation of the MSC sea waybill. (Sikma Decl. ¶¶ 46-47).

140. Because Deltech cannot provide its shipper's letter of instruction to Panalpina until the actual container serial number is known, the process of preparing the bill of lading documentation only occurs after the DVB shipments are already in transit. (Vincent Dep. Tr. 20:11-28:16).

141. Consequently, it was not until June 25, 2012, four days after the subject DVB shipments had already been delivered to the terminal (Bozzo Tr. 857:9-13, 857:25-859:15), that BDP sent MSC USA's Documentation department the master bill instructions that MSC USA used to prepare the sea waybills for the subject DVB shipments. (PX-335; PX-336; PX-337; Breaux Dep. Tr. 141:19-142:17).

142. Mr. Bozzo, who in 2012 was the president and CEO of MSC USA, testified that "except for refrigerated cargo . . . only a very small fraction of the shipment booked with MSC" involved any request for special stowage, segregation, or handling. And in the case of dangerous goods, it is "exceedingly rare" for a customer to make any special request other than what is already provided for under the IMDG code. (Bozzo Decl. ¶ 33).

143. In a situation where a customer is booking dangerous goods and does make a special request, MSC considers each request and determines whether it is operationally feasible and can be safely carried out. (*Id.* at ¶ 34).

144. Both MSC SA and MSC USA expect that any special request will be made by the customer before or at the time of booking and will be raised with the booking representative and with either the booking representative involved or with the relevant line manager for the trade, because these are individuals that communicate with customers. (*Id.* at ¶ 35).

145. There may be additional charges if a special request is determined to be operationally feasible. (*Id.* at ¶ 36).

146. If a customer had brought this information for a special request to MSC's attention prior to or at the booking process, it would have been reported to the line managers as well as the marine operation and hazardous departments. If the special request for operation is

feasible, and did not raise safety concerns, some arrangement for carriage could possibly be made. (*Id.* at ¶ 48).

147. Mr. Bozzo testified that while there is no MSC policy or regulation prohibiting information such as "keep away from heat sources" on a bill of lading; he testified that if such a request was not made at the time of booking, and subsequently approved, then MSC would not put that instruction on the MSC sea waybill because it was not approved at the time of booking. The reason is that the sea waybill is created after the fact so it is an after-the-fact piece of information and it would not be put on the bill of lading. (Bozzo Tr. 905:3-906:24).

                Respectfully submitted,

                RICCI TYRRELL JOHNSON & GREY

           By: */s James W. Johnson*
                James W. Johnson, Esquire
                Attorneys for Defendant,
Dated: 8/27/18         BDP International, Inc.